Adam G. Bridge
Office of the Federal Public Defender, District of Utah
46 W. Broadway, Ste. 110
Salt Lake City, UT 84101
Phone: (801) 524-4010 │ Fax: (801) 524-4060
Email: adam_bridge@fd.org

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| United States of America,  Plaintiff,  vs.  John D. Huggins,  Defendant. | **Sentencing Memorandum**  Case No. 1:14-CR-035-DN |

John Huggins stands convicted of possessing an unregistered destructive device—more specifically, a partially-built, inert, improvised explosive device (IED).[1] Mr. Huggins did not build the IED in a vacuum or on a whim. To the contrary, he was carefully lured over the line of criminality by the Tremonton Police Department and the FBI. This memorandum will summarize that investigation and provide a number of reasons for the Court to impose the following sentence: 1 year and 1 day of imprisonment, 36 months of supervised release, no fine, and a $100 special assessment. In the alternative, Mr. Huggins requests a probationary sentence with six months of community confinement in the residential reentry center.

---

[1] Huggins possessed the necessary parts to arm the IED in his trailer.

1

## Nature and Circumstances of the Offense

In February 2014 the Tremonton Police Department received a tip straight out of a Tom Clancy novel. The tipster, a young man named Donnie Peters, told detectives that John Huggins was the criminal mastermind behind a separatist group planning to take over the City of Tremonton.

Peters told detectives how the attack would unfold. First there would be a bombing of the local police station. Then the group would destroy or seize key pieces of infrastructure leading in and out of town. As chaos ensued, the group would post signs saying, "Do not fear us, we are on your side, we want you to be free." Huggins and his group were ready to defend the town against the military and expected the townspeople to rise up and support their cause.

Peters said the attack was imminent. Huggins had already placed bombs in strategic locations around Tremonton. In the meantime, Huggins and his group were laying low, pretending to be homeless. Huggins and his men were also meeting regularly for "bible study," where they shared intelligence and finalized their plan. Peters told detectives that Huggins wanted him to join his group and play a key role in the upcoming attack.

Huggins had a reputation in Tremonton that made Peters' story believable. He was a loner. He was smart. He had years of military training and experience with explosives. He had an affinity for firearms and a prior conviction involving an incendiary device. Nevertheless, Peters said a number of strange things during his

interview that should have given investigators pause. For example, Peters said that Huggins had approached him at the "crack shack," a local gas station where Peters usually stopped for a cookie and a Red Bull on his way to work. Huggins had revealed his group's entire plan to Peters—a potential recruit—in the time it took Peters to gas up his truck. Stranger still, Peters said he saw several men materialize in bushes and on buildings near the gas station while talking to Huggins, and Huggins was directing the men through a sophisticated system of hand signals.

Detectives did not challenge a single part of Peters' story. Instead they asked him to help bring Huggins down. Peters agreed. Detectives promised Peters they would make Huggins' life as miserable as possible. They vowed to coordinate with state and national law enforcement agencies to build a case that would put Huggins away for forty (40) years.

And that is precisely what they did. The Tremonton detectives contacted the FBI and told them Huggins was plotting an act of domestic terrorism. Peters made recorded telephone calls to Huggins. The calls led nowhere. Peters tried to meet Huggins and gather information. The meetings never materialized. Authorities conducted surveillance of Huggins and his associates. They saw nothing actionable. Tremonton detectives leaned on local informants for information about Huggins and his separatist group, but they developed no leads. After two months of investigation, authorities failed to find a single bomb, co-conspirator, or any other evidence of a separatist plot.

In April 2014 the FBI stepped away from the investigation. Huggins had not done anything to corroborate Peters' story or otherwise sustain their interest. The Tremonton Police Department pushed on. Detectives continued to investigate and work their local informants, despite learning that one of them was feeding them lies about Huggins to keep himself out of jail.

In May 2014 the Tremonton Police Department finally caught a break. An informant that had lied and strung them along for months bought a thumb drive off Huggins containing 16 gigabytes of information about manufacturing drugs, booby traps, and explosives.[2] The thumb drive piqued the FBI's interest again and arrangements were made to introduce Huggins to an undercover agent posing as a friend of the informant's with ties to a separatist group in Wyoming.

Huggins was led to believe the undercover agent had seen the thumb drive and wanted to hire Huggins to teach his group how to build explosives. During the first meeting, the undercover agent hit all the right buttons. He was very impressed by Huggins' military experience. He feigned sympathy for Huggins' financial and legal troubles. They complained about the government and talked about guns and explosives. The undercover agent lavished praise on Huggins and told him he could set his own price for his consulting services.

Not surprisingly, Huggins expressed interest in working with the undercover

---

[2] Interestingly, the informant was with Huggins when he downloaded the information off the internet, which means the informant—and by extension the Tremonton Police Department—might have been complicit in the thumb drive's creation.

4

agent and agreed to meet again. After the meeting, Huggins took the undercover agent back to his trailer and showed him family photos, photos from his days in the National Guard, and a homemade video of himself blowing up an old car.

A few days later the local informant told authorities that Huggins was manufacturing shrapnel in his trailer. A day after that, the informant said Huggins had completed an explosive device. Authorities quickly arranged a second meeting between Huggins and the undercover agent. On the morning before the second meeting, Tremonton detectives gave the local informant money to give Huggins to buy black powder pellets and Tannerite from a local hardware store.[3]  Huggins and the informant purchased the items before the second meeting.

Huggins treated the second meeting like a job interview. He brought along letters of reference, copies of his military commendations, and talked at length about his service in the National Guard. Huggins talked about his work experience at Morton Thiokol developing airbags. To demonstrate his knowledge of explosives, Huggins presented the undercover agent with a lab notebook filled with crude schematic drawings of explosive devices. At the end of the meeting, Huggins agreed to show the undercover agent an inert device he had built in preparation for the meeting. Huggins, the local informant, and the undercover agent were arrested as they walked out of the meeting. When authorities searched Huggins' trailer, they found a partially constructed IED and the materials referenced in the Presentence

---

[3] It's unclear why detectives gave the informant money to buy these items if they believed Huggins already possessed an explosive device.

Report.

## History and Characteristics of the Defendant

Mr. Huggins is not part of any separatist movement. He was actually a law-abiding and highly-productive member of society until his late thirties. Then, like many people, Huggins experienced a series of personal and professional setbacks from which he has never fully recovered. Overall, Mr. Huggins' history and characteristics exemplify the principle that every criminal defendant is a "unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."[4]

As a child, Mr. Huggins was a gifted student.[5] Presently he is only a few credits shy of a bachelor's degree in accounting with a 3.97 GPA.[6] Mr. Huggins was raised in a middle-class family in northern Utah. He had a distinguished military career and held several long-term, high-paying jobs. Mr. Huggins was married for nineteen (19) years and raised three (3) children.

Mr. Huggins started experiencing some hardships in 1999. First he lost his job at Morton Thiokol, where he worked for over 10 years in the research and development department. Ironically, the company fired Mr. Huggins after learning he had reported them for mishandling explosives. Mr. Huggins' marriage fell apart soon afterwards and he was divorced in 2003. He has struggled with unemployment,

---

[4] *Koon v. United States*, 518 U.S. 81, 113 (1996).
[5] *See* Letter from Kathy Bunn, Huggins's sister, attached as Exhibit A.
[6] *See* Stevens-Henager College Transcript, attached as Exhibit B.

relationships, substance abuse, and mental health issues ever since.

On balance, Mr. Huggins is a highly-intelligent, highly-skilled, and capable person. He is a veteran who loves his country and would do anything to defend it. Mr. Huggins has a loving and supportive family that wants to help him succeed. With the proper interventions, Mr. Huggins can once again be a law-abiding and productive member of society.

### Punishment, Deterrence and Protecting the Public

The sentence Mr. Huggins recommends is sufficiently punitive. It also promotes deterrence and public safety.

In August 2013 Attorney General Eric Holder lamented that "too many people go to too many prisons for no good law enforcement reason."[7] The Sentencing Reform Act does not require, or even suggest, that the goals of sentencing are best served by incarceration. In fact, the legislative history of the Sentencing Reform Act indicates that Congress felt "it may very often be...that [supervision] under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose."[8] Research also shows that increasing the severity of punishment does not have much effect on crime, while increasing the certainty of punishment does have a deterrent effect.[9]

Mr. Huggins has been in jail since July 10, 2014. This is his first felony

---

[7] http://www.justice.gov/iso/ipa/ag/speeches/2013/ag-speech-130404.html.
[8] *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) (internal citation omitted).
[9] Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, THE SENTENCING PROJECT, November 2010, at 4.

conviction. Mr. Huggins has never spent more than ninety (90) days in jail. There is no good law enforcement reason to send him to federal prison. Further incarceration could actually increase his risk of recidivism and have a deleterious effect on public safety.

## Rehabilitation

Mr. Huggins does not need much rehabilitation. He needs a helping hand and a push in the right direction. The best tools to help Mr. Huggins are the standard and special conditions of probation and supervised release, including vocational rehabilitation, mental health counseling, and outpatient drug treatment.

## Conclusion

Mr. Huggins is not a character from a Tom Clancy novel. He is a real person with flaws, idiosyncrasies, and the possibility of redemption. His sentence should also reflect law enforcement's unusual efforts to entice and cajole him into committing this offense.

Dated this 5th day of June, 2015.

Respectfully Submitted:

/s/ Adam G. Bridge
Adam G. Bridge
Assistant Federal Public Defender