CARLIE CHRISTENSEN, United States Attorney (#633)
CARLOS ESQUEDA Assistant United States Attorney (#5386)
ANDREW CHOATE, Assistant United States Attorney (#13615)
Attorneys for the United States of America
185 South State Street, Suite 300
Salt Lake City, Utah   84111
Telephone:   (801) 524-5682

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, NORTHERN DIVISION

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | Case No. 1:14 cr 00035 |
| vs. | RESPONSE TO SENTENCING MEMORANDUM |
| JOHN HUGGINS | Chief Judge David Nuffer |
| Defendant. | |

The undersigned Assistant United States Attorney hereby responds to the Defendant's Sentencing Memorandum dated June 5, 2015. (Dkt. No 48.)

In February 2014, a confidential informant ("CI 1") informed law enforcement from the Tremonton Police Department ("Tremonton P.D.") that he had recently spoken with an individual named John Huggins ("the defendant"). "CI 1" reported that the defendant stated that he was planning on targeting the Tremonton P.D. with explosives. CI 1 stated that he had never been afraid of a man before but that he feared the defendant and was fearful of providing any information to the Tremonton P.D. The officers agreed

with CI 1 that the defendant posed a threat to their safety and the community of Tremonton. The officers contacted the Federal Bureau of Investigation ("FBI") for assistance with the investigation due to the perceived threat and the potential for the use of explosives.

The FBI then made contact with the defendant through another confidential informant ("CI 2") in May or June of 2014. CI 2 met with the defendant and bought a thumb drive that contained references on how to start and train militias, and how to produce explosives. At that time, the FBI worked to have CI 2 personally introduce an undercover agent ("undercover") to the defendant. The undercover posed as a representative from an anti-government militia group and told the defendant that he was looking for someone that could make explosives and train people in his group. The defendant then answered in the affirmative- that he could do that. As indicated in the defense's sentencing memorandum, the defendant took this first meeting seriously and gave a detailed background on his long history with explosives, including the fact that he had manufactured explosives for his personal use. Later in that first meeting, the defendant told the undercover that he "could design an insurgency with 20 people that could descend the whole state into marshal law… and people could try and call the police but the (expletive) police won't be there because the police are scared because they have had their (expletive) handed to them five times before…." The defendant repeatedly discussed his extreme dislike of law enforcement based on his prior interactions with the police. The defendant tried to sell the undercover a flash drive with explosives

information at this meeting, but the undercover declined the offer, stating a lack of money. At the end of this first meeting, the defendant invited the undercover into his trailer, where the defendant showed the undercover what he was capable of. The defendant showed the undercover a video of himself blowing a car apart with a device containing two pounds of powerful explosives.

During the second meeting, the defendant went to great lengths to convince the undercover he could legitimately build explosives, including a high explosive known as shape charges, a type of explosive the defendant had manufactured himself and that "could not be resist(ed)" by other materials. The defendant explicitly told the undercover that the explosives he could manufacture could "kill people and break shit." The defendant discussed blast radiuses for smaller explosives that he had produced and offered that if the same devices were thrown in the room the meeting was taking place in, it would kill a couple of people. The defendant offered to come out and train the undercover's group for a month and charge a fee of two thousand dollars per month. The defendant also presented and sold a notebook to the undercover at this time. The notebook included drawings detailing explosive production and accurate writings on explosive theory and how to produce different types of explosives.

The defendant was then arrested and interviewed by agents from the FBI. The defendant admitted that he was meeting with a man he believed to be a member of a militia extremist group. The defendant self-reported to interviewing FBI agents that he did not perpetuate domestic terrorism, and at the same time, admitted to supplying a

˘3˘

representative from an extremist militia group with a flash drive, a notebook with information on military tactics and explosives, and admitted that he had agreed to train an extremist militia on the production of explosives. The defendant then stated that he did not provide the undercover with an explosive device at the second meeting, but that he did have an inert explosive device in his trailer that he had planned on showing the militia representative. The defendant stated that the device would need to be loaded first to become a bomb. The defendant admitted that all of the necessary components to fully assemble the explosive were at this residence. Specifically, the defendant admitted that the explosive device could be made active with a substance in his trailer, and that this device could "mess you up pretty good" if anyone was "within a 5-6 foot radius." The defendant offered that if he made certain modifications to this same device, and coupled it with another substance in his trailer; he could make a "high explosive incendiary with the blast radius of 50-60 feet." The defendant again admitted that he had agreed to train the extremist militia group on the production of explosives.

  A further search of the defendant's trailer yielded notebooks containing what appears to be a diary. The diary includes several troubling entries ranging from anti-government ideology, to a system to watch and track police, to the unlawful use of explosives against the government.

  The defendant was not a pawn in a fictional story, he was a skilled and motivated explosives "expert" that was willing to train and manufacture explosives for an anti-government militia group. Although the defendant argues that the undercover posing

as an extremist militia member never directly told the defendant that people would get hurt, the two regularly discussed the potential for extreme violence. On several occasions during the only two recorded undercover meetings, the defendant himself appeared to understand the likely context that the explosives would be used in. The defendant repeatedly stated that people could be killed at the hands of the explosives he would produce, and even referenced specific numbers of deaths that could be caused by certain types of explosives he could build. Additionally the defendant knew that the group he was training was an anti-government militia, making it incredible for the government to believe that he did not understand that potential for extreme violence that his training could cause. At no point did the FBI attempt to "lure" the defendant across the line into committing criminal conduct during this domestic terrorism investigation. The goal of the investigation was to assess the defendant's threat to the public and the government, and to give the defendant an opportunity to prove or disprove law enforcement's perception of the defendant as a serious threat. At all times the defendant proved he was an actual threat as he stood ready, willing, able, and extremely motivated, to voluntarily train an extremist militia group on how to manufacture explosives. As proof of this, he assembled a destructive device in his trailer that had the potential for grave damage. For these reasons, and based on the facts presented in the presentence report, the United States opposes the defendant's proposed sentence of a year and a day of imprisonment.

DATED this 10th day of June, 2014.

                                  Carlie Christensen
                                  United States Attorney

                                  /s/ Andrew Choate
                                  _____
                                  Andrew Choate
                                  Assistant United States Attorney